Nott, Ch. J.,
delivered the opinion of the court:
This is believed to be the first case brought before a court in which a State has united in one undertaking an exercise of the police power with a commercial business. The exercise of the police po.wer is by legislating and limiting the sale of intoxicating liquor; the commercial business is that of buying and selling such liquors for profit; the question involved is whether the dispensary agents of the State can be required to pay the special tax or license fee imposed on dealers in liquors by the internal-revenue laws of the United States.
The counsel of the United States has offered evidence to show that the exei’cise of the police power is little more than a disguise; and he has contended that the real purpose of the assumed exercise of the police jaower — the substance and not the form — must be considered; and that the real purpose of the South Carolina dispensary system is that of making money. The evidence offered shows, or tends to show, that there are 260 persons now selling intoxicants as retail dealers under United States internal-revenue licenses; that in the city of Columbia there are numerous places in the immediate neighborhood of the dispensaries, and within sight of the State capitol, where liquor is openly sold; that where the keepers of drinking saloons purchase from the dispensaries they are not prosecuted, and that when the business of selling at a profit was once interrupted the State seriously contemplated abandoning the system. The counsel for the *281 claimant, on the contrary, that the consumption of intoxicating liquor in the State has. been greatly reduced and the evils of intemperance consequently diminished; and he has contended that neither the-violation of the law by individuals nor the lax administration of it by State officers can be regarded as a part of the system or as sufficient reason why the exercise of the police, power should be denied to the State.
It seems to us clear — it seems, indeed, incontrovertible— that in South Carolina, as elsewhere, a large portion of the people are honestly and earnestly in favor of the system for-the single-minded purpose of repressing the many evils of intemperance; that a portion of the people there, as elsewhere, reason no further than that if intoxicants must be sold, and consequent drunkenness and crime must exist, it is fair that society, which has to support and bear the expenses incident to. crime and pauperism, should receive the profits of the business rather than the individual vendors, who, by their traffic, are the immediate cause of these evils. There is also in South Carolina, as elsewhere, a third class, who, care little for the general welfare; whose motive is their own pleasure or profit; who do not believe in prohibition, and who evade and defy this law as other laws for a similar purpose have been evaded and defied in other States. In the consideration of this case the court puts aside all of the evidence above referred to and rests its decision exclusively upon what may be called the official record — that is to say, upon the statutes of the legislature and the action of the executive.
The commercial character of the State’s undertaking is stamped unmistakably upon the system. The statute establishing it authorized a profit of 50 per cent and contemplated large profits, directing the manner in which they should be utilized and distributed. As a matter of fact, the system has. been a great commercial success and lias yielded large profits. In 1898, however, -the system as a business was confronted by judicial interference in the form of an injunction which enjoined the State officers from interfering with the delivery and sale of liquor brought into the State from beyond its, *282 borders. The governor of South Carolina regarded the injunction as a blow possibly, if not probably, fatal to the system itself. In his annual message he brought the subject before the legislature and said:
“Judge Simonton has destroyed, along with the dispensary, the license system when run for profit. What, then, is left to do ? We must either enact prohibition or continue the dispensary system without the profit feature. Many, a majority, I believe, do not think prohibition is practicable; and many have approved the dispensary system because of the profit feature. We can certainly get rid of the ‘ original package ’ dealer and their demoralizing traffic by continuing the dispensary, shorn of all profits and administered only as o, police regulation to control and reduce the liquor evil. The Federal judge will have neither occasion nor excuse for his ever-reacly injunctions, if that system shall be inaugurated, unless he shall again reverse his own previous decision. This, then, appears to me to be the best and almost the only thing left for us to do. We might try this policy for a year, and next winter, after Congress shall have acted or failed to act, and after the Supreme Court at Washington shall have decided what is to become of the Sate’s power to control liquor under the Wilson bill of 1890, we shall be in a position to take final action.”
And in his annual message of the following year he said:
“ The dispensaries have been forced to fight free whisky on terms of absolute equality; yet, strange to say, they have fought it successfully; for while the profits toere reduced by this lawless competition, there was still enough business to make the dispensary self-supporting and leave a small margin of profit"
The legislature apparently acquiesced in the suggestion of the executive in 1898 to “ try this polic}'' for a year,” and allowed the system to continue; and it continued to do business and to make a profit upon its business, as shown by the above quotation from the message of 1899, notwithstanding that imported liquor was brought into the State and sold in the original packages. But before the year of probation expired the competition which the governor of South Carolina deplored was largely, if not altogether, removed by the decision of the Supreme Court in Vance v. Vandercook (170 U. S., 438), wherein it was held that the purchaser within a *283 State has the constitutional right to receive packages sent from another State for his own use, notwithstanding that there be State laws to the contrary, but that he can not sell'in the original packages in defiance of State law. There was thus restored to the State substantially its monopoly of the sale of intoxicating liquors, and the business yielded a net profit in the year 1901 of $545,248.12.
The right of the State of South Carolina to carry on the business of its dispensary system exempt from the Federal excise tax is rested on one or the other of two general constitutional principles: That the dispensary system is an exercise of-the police power of the State, beyond the interference of the General Government; that the National Government has no constitutional power to impose a tax upon the administrative agencies of a State government.
It will avail ns nothing to appeal to the letter of the Constitution. The framers of the Constitution had before them during one hundred days of unapproachable constructive work three great purposes. The first was the construction of a new National Government. The second was the establishment of a dual system of government and the distribution of powers between the General or National Government and the local or State governments. The third was placing certain immutable restrictions upon the powers of government— restrictions which might apply to the National Government or the State governments, or to all, for the purpose of securing the individual rights of the citizen and making constitutional liberty perpetual and secure.
There are special provisions of tlie Constitution, such as that Congress shall have power to “ coin money; ” to secure to “ authors and inventors the exclusive right to their respective writings and discoveries; ” such as that no State shall “ keep troops or ships of war in time of peace ” or “ enter into any agreement or compact with another State; ” or “ make anything but gold and silver coin a tender in payment of debts,” or pass a law “ impairing the obligation of contracts; ” such as that “ full faith and credit shall be given in each State to the public acts, records, and judicial proceedings of every other State; ” that the “ citizens of each State shall be entitled to all privileges and immunities of *284 citizens in the several States; ” that “ no preference shall be given to the ports of one State over those of another.” But such provisions are always directly or indirectly in furtherance of one or the other or all of the three great purposes of the framers.
The statutory provisions, declarative and restrictive, by which the people of several States in recent constitutions have tied their representatives’ hands and their own have no place in the framework of government established by the Constitution.
In the present constitution of South Carolina (1895), and in relation to this same dispensary system which is now before the court, there is a statutory regulation or proviso “ that no license shall be granted to sell alcoholic beverages in less quantities than one-half pint, or to sell them between sundown and sunrise, or to sell them to be drunk on the promises.” In the three systems generally known as the “ Swedish system ” is one regarded as the most effective of the three, which, in the country and small villages, requires the liquor sold at a government dispensary to be drunk on the premises, and prohibits its being carried away to inebriate the purchaser and destroy the peace and happiness of his home; yet the people of South Carolina have inhibited their representatives and themselves from even so much as trying that experiment. The framers of the Constitution attempted no such restrictive legislation, but left the people of the United States free to make their own laws and, by the proper discharge of the duties of citizenship, to work out their own political salvation.
Moreover, at the time of the adoption of the Constitution there probably was not one person in the country who seriously contemplated the possibility of government, whether State or national', ever descending from its primitive plane of a body politic to take up the work of the individual or body corporate. The public suspicion associated government with patents of nobility, with an established church, with standing armies, and distrusted all governments. Even in the high intelligence of the convention there were men who trembled at the power given to the President, who trembled at the power which the Senate might usurp, who feared that *285 tlie life tenure of the judiciary might imperil the liberties of the people. Certain it is that if the possibility of a government usurping the ordinary business of individuals, driving them out of the market, and maintaining place and power by means of wliat would have been called, in the heated invective of the time, “ a legion of mercenaries,” had been in the public mind, the Constitution would not have been adopted, or an inhibition of such power would have been placed among Madison’s amendments.
Accordingly, we find in the Constitution the power expressly delegated to the National Government to “ lay and collect taxes, duties, imposts and excisesand the power expressly prohibited to the States, without the consent of Congress, to “ lay any imposts or duties on imports or exports;” but no such restriction was laid upon either the National or State governments in regard to the exercise of the police power. The police power is the power “ to impose those restraints upon private rights which are necessary for the general welfare.” It is a power inherent in all governments, needing neither grant nor recognition in the Constitution. Without it civilized society in dense population would be constantly drifting back toward barbarism. In this country it can not be said to be wholly unrestricted, but the restrictions begin only where the exercise of it trenches upon the constitutional rights of individuals or of the States. It has been called an implied power, but is not, strictly speaking, an implied power, but an inherent power, which is neither inhibited nor regulated by the Constitution. The cases which have come before the courts have generally been cases in which the exercise of the police power has trenched upon the constitutional rights of individuals or been in conflict with the reciprocal rights of the States to interstate commerce, or in which a State legislature has sought to do something in the disguise of an exercise of the police power which is prohibited by its State constitution. In this case no such conflict exists. The right of the State to regulate or prohibit the sale of intoxicants is conceded; the right of the State to do so in this particular way is not, in the opinion of the court, involved. The National Government, in effect, says to the State, “ Exercise your police power as you will, but pay to *286 the National Government a tax which is authorized by the Constitution and imposed by statute.” The National Government does not interfere with the exercise of the police, power; but the National Government can not be compelled, directly or indirectly, to aid it. The police power extends no further than the general welfare. The general welfare is one thing; exemption from taxation is another.
As regards the second ground upon which this suit rests, the ground that the Constitution contains no grant of power, express or implied, to tax -a State or its means and instrumentalities of government, the court is aware of the decisions of the Supreme Court, which may be summed up in the income-tax case, that “As the States can not tax the powers, the operations, or the property of the United States, nor the means which they employ to carry their powers into execution, so it has been held that the United States haire power under the Constitution to tax either the instrumentalities or the property of a State.” (Pollock v. Farmers’ Loan and Trust Company, 157 U. S., 429, 584.)
But between the principle involved in those cases and the principle involved in this case there seems to the court to be three broad and plain distinctions:
The first distinction is fundamental. The money exacted here is not a direct tax, but an excise. It was at the time of the adoption of the Constitution, and still is, the theory upon which the constitutional provision rests that an excise upon a salable article is paid by the purchaser. A tax is obligatory; from it there is no escape. An excise is voluntary; the purchaser who would pay it can not be compelled to purchase. As was said by Mr. Justice Brown in Pollock v. Farmers’ Loan and Trust Company (157 U. S., 429, 491), “ direct taxes are paid by the taxpayer, both immediately and ultimately; indirect taxes are paid immediately by the taxpayer and ultimately by somebody else.” The State of South Carolina here stands on precisely the same footing which every other dealer stands upon. All that it has to do is to add this internal-revenue excise to the price of the liquor which it sells and let the purchaser pay it. If there be exemption, it will not be the State which will be exempted from the payment of this excise, but the purchaser of liquor within the *287 State. That the increase of the price may invite smuggling ancl promote illicit selling and lessen the power of the State as a dealer in the struggle of competition are objections, but they bear no more heavily on' the State than on the individual dealer. These things add to his expenditures; they increase his prices; they lessen his sales; they impair his power to compete; but nevertheless in the contemplation of the Constitution and in the contemplation of the law it is the purchaser and not the dealer who pays the tax.
The second distinction is that in the income-tax cases a tax had been extended to “ a function strictly belonging ” to a State “in its ordinary governmental capacity.” (The Collector v. Day, 11 Wall., 113; Ambrosini v. United States, 187 U. S., 1.) If, for illustration, the General Government were to tax the salaries of State officers, it would be taking money of the State by which it intended to procure the services of effective officers. It would be taking money which had been paid by the taxpayers of the State for carrying on the State government and which had been paid to the officers of the State for the necessary expenses of obtaining their official services. Raising money by taxation and employing salaried officers are ordinary instrumentalities of government. The exaction of an income tax from a State officer woidcl be but a method of diverting the revenue of the State to the revenue of the General Government. It is manifest that if the General Government could take a. part of the salary of a State officer through the instrumentality of taxation, and a. State could take a part of the salary of a national officer, there being no limitation which the judiciary can impose upon the extent of the taxing power, there would be no limitation upon the retaliatory extent to which it could be pushed. In. this case now before us the money exacted by the United States was not paid by the taxpayers of South Carolina, but by purchasers at its dispensaries; and it was not expended for ordinary governmental purposes, but as incident to carrying on its commercial business. The court does not question the power of the State to carry on this business, and does not doubt that the proceeds of the business lessen the taxes of the taxpayers. All that it decides is that the business of *288 the dispensaries was, intrinsically, business and not government; and being business was subject to the same national tax which is borne by all other persons engaged in the same business.
The third distinction is that in the income-tax case of The Collector v. Day (11 Wall., 113) the money being raised for governmental purposes and expended upon governmental purposes, the purposes, though not defined, were in their nature limited. Here, if the principle contended for is established, there seems no limitation upon the extent to which it can be carried. If the State, because it is a State, can buy and sell without being subject to the internal-revenue tax which is borne by other persons who buy and sell, at what point can it be held that exemption from taxation ceases ? It is contended by many writers that the substitution of beer and wine for distilled liquors will satisfy the craving for alcohol on the one hand and relieve abnormal humanity from its vices and evils on the other hand. If the State in the exercise of its police power should determine that an effective remedy for alcoholism would be the substitution of the light wines of -Europe for whisky and brandy, would it be at liberty to import and claim exemption from customs duties? It is generally believed that many of the evils of alcoholism are caused bjr impurities in the liquor sold, by improper manufacture, by the mixing and flavoring which bring poisonous matter into the liquor. If the State, in the exercise of its police power, should deem it for the general welfare to furnish its citizens with pure distilled liquors, and for that purpose to manufacture as well as sell, would it be exempt from the distiller’s tax ? The amounts paid for licenses, set up in this suit, are trivial. The exaction of them will only theoretically affect the dealer’s price, but the saving of the distiller’s tax would, in effect, be an enormous bounty in favor of the State. The State could sell beyond its own borders, or at least could sell to its own citizens, who could sell beyond its own borders. To be able to sell free from taxation would be a power that would break down all competition wherever the State chose to compete. The more this subject is studied the more clearly it appears to the court .that the State has a right to the exercise of its police power, *289 and a right to the use of all proper instrumentalities of government, and a right to enter into this commercial business of buying and selling for a profit; but that none of these rights can be exercised as an evasion of the National Government’s right to impose an excise tax and to subject all persons, whether State or private corporations or individual dealers, to the same law.
There are a number of minor questions in the case which were exhaustively argued by counsel on both sides, such as (on the part of the defendants) that the claimant should have presented its claim to the Commissioner of Internal Revenue for the remission of the tax as illegally collected; such as (on the part of the claimant) that the statute (14 Stat. L., p. 1G3, sec. 44) imposing this excise uses only the term “ corporation,” and was not intended to apply to a State. But it seems plain, if a State is a power above and exempt from the operation of the revenue laws, that it can not be compelled to resort to them for redress; and, conversely, that if a State is not a power constitutionally exempt from all national taxation in its commercial transactions, but is, like other persons and corporate bodies, subject to the conditions which the law imposes, the court can not read into the statute an exemption which is not needed by reasonable construction or by the ordinary principles of justice, and which will be an arbitrary departure from the plain, positive language of the statute. The great question in this case is whether the United States can impose an excise tax upon a State when the State carries on a commercial business for profit, a business which, in the hands of any other person or body corporate, will be subject to the terms and conditions of the Federal revenue laws. Not until the chief, the fundamental, question in the case is disposed of can a decision be intelligently given upon the minor questions presented.
The court has not overlooked the fact that in one instance a State was carrying on an ordinary commercial business, owning and operating a railroad, and that one court of the United States held that it was not intended that a State should be included in the requirements of this statute by the term “ corporation ” (State of Georgia v. Atkins, Collector, 35 *290 Ga. R., 315), and. that the decision has been referred to in an indirect way by one of the judges of the Supreme Court (United States v. Railroad Company, 17 Wall., 322, 328). But this court is constrained to say that the magnitude of .the • present question was not presented to the court in Georgia and was not considered, and that the question involved there was not involved in the case in the Supreme Court, where all that was held was that a municipal corporation is a portion of the sovereign power of the State, and is not subject to taxation by Congress upon its municipal revenues. But, as was said by tivo of the dissenting judges in that case (p. 334), “ it by no means follows that the private property owned by such corporation,” “ and used merely in a commercial sense for the income, gains, and profits, is not taxable just the same as property owned by an individual, or any other corporation.” Such decisions as in The Republic of Honduras v. Soto (112 N. Y., 310) and Salt Lake City v. Hollister (118 U. S., 256) admonish us that such terms as “ person ” and “ corporation ” are broad enough in statutory construction to include the corporate side of a government or municipality. The principle which rules and guides is this: The exemptions of sovereignty extend no further than the attributes of sovereignty.
The judgment of the court is that the petition be dismissed.